441 So.2d 460 (1983)
Sam L. SMART, et al., Plaintiff-Appellee,
v.
Homer WOODARD, et al., Defendant-Appellant.
No. 15813-CA.
Court of Appeal of Louisiana, Second Circuit.
November 29, 1983.
*461 Campbell, Campbell & Johnson by John T. Campbell & John C. Campbell, Minden, and Gold, Little, Simon, Weems & Bruser by Herbert J. Mang, Jr., Alexandria, for plaintiff-appellee.
Hudson, Potts & Bernstein by B. Roy Liuzza, Monroe, and McKeithen, Wear & Burns by Russell Woodard, Columbia, for defendant-appellant.
Before PRICE, HALL and NORRIS, JJ.
NORRIS, Judge.
In this quo warranto, mandamus and injunction proceeding the First National Bank of Arcadia (hereinafter referred to as the "Bank"), Homer Woodard, and Herschel Kyle appeal a judgment nullifying an election of directors and officers and granting additional relief related to actions taken at the 1983 shareholders' meeting.
The pivotal issue presented in this appeal is whether a shareholder who has sold stock in a bank but in whose name it remains registered on the bank's records with the knowledge and consent of the purchasers who have pledged that stock to the seller in connection with the sale has a legal right to vote that stock? Finding that the shareholder of record does have the right to vote *462 the stock under the particular facts presented in this appeal, we reverse.
During the Fall of 1981, Homer Woodard was the owner of 27,615 shares of stock in the First National Bank of Arcadia, which comprised more than 50% of the 54,080 outstanding shares and decided to sell his majority interest. Herschel Kyle, an officer/director of the Bank who was Woodard's cousin formed a group composed of Sam Smart, Mack Waits, William Ingram and himself, to purchase the stock at $80.32 per share. The group's intention was to retain control of the Bank in the community by selling the greatest portion of the stock to local citizens other than members of their group. Accordingly, the 27,615 shares of stock were distributed as follows: Persons outside of the group purchased 7,615 shares which were transferred directly from Woodard. An additional 10,000 shares were distributed among the members of the group proportionately in the amounts of 2500 shares each and were transferred to each member accordingly. These shares of stock were pledged to the First National Bank of Commerce to secure the loan for the purchase price paid to Woodard. The remaining 10,000 shares which form the basis of this proceeding were also sold to the four members of the group for $823,000. Two days prior to and in contemplation of the sale, the Bank was instructed to reissue ten certificates in Woodard's name, each certificate representing 1000 shares. These stock certificates were pledged to Woodard to secure the debt in an "Act of Pledge of Stock". The debt is evidenced by four notes each in the amount of $205,800, executed by a member of the group and endorsed by the remaining members. While the pledge agreement is silent regarding dividends, voting rights or other shareholders' rights, the agreement contains a release and substitution of collateral clause to effectuate the parties' intention to sell these shares to persons outside of the group at a later time. Each of the parties to the transaction admittedly knew that this particular stock was registered in the name of Homer Woodard and obviously desired that it remain so registered on the Bank's records in order to facilitate the contemplated sale of this stock to others and to avoid the parties' being in violation of Federal law regulating the transfer of control of a national bank. Neither the pledge agreement or any other writing evidencing this transaction or any agreement incidental thereto was ever filed with the Bank or in any other manner entered into its official records.
The record reveals that in January, 1982, these 10,000 shares were voted as a block by Woodard in accordance with the wishes of the four members of the group. All four members of the group were in agreement and were elected directors of the bank at that meeting. However, at some point thereafter, a disagreement arose among the directors concerning the proper management of the Bank. Smart and Waits became aligned as did Kyle and Ingram on the adverse side. Sensing a showdown at the January, 1983 shareholders' meeting, the parties began purchasing stock and securing proxies. Smart frankly admitted that in connection with the stock which he purchased he secured proxies from the vendors in order to be able to vote that stock at the 1983 annual meeting because the stock would still be registered on the Bank's books in the name of his vendors.
At the January, 1983 meeting, the 10,000 shares which remained registered in the name of Woodard were crucial to the outcome of the parties' dispute. At the meeting, Woodard admittedly was aligned with the Kyle/Ingram faction and voted the 10,000 shares accordingly over the objection of Smart and Waits who directed that he vote 5000 shares for the election of Smart as chairman of the meeting, for the motion to increase the size of the Board of Directors and for the eight persons nominated for the Board by a supporter of the Smart/Waits group. Five members of the Board were then elected, the majority of which favored the position adverse to Smart and Waits.
Thereafter this suit was instituted by Sam L. Smart and Richard Mary, another shareholder, against the members of the *463 newly elected Board[1] and the Bank seeking the following relief:
(1) to have all individual defendants who are members of the board of directors elected at the January 31, 1983 meeting declared to have been illegally elected as officers and directors of the Bank and without title to the office to which they were allegedly elected at the shareholders' meeting;
(2) to perpetuate the writs of quo warranto and mandamus previously issued;
(3) to enjoin temporarily and permanently the defendants from acting as officers or directors of the Bank pursuant to any actions of the shareholders' meeting held on January 31, 1983;
(4) to reinstate the officers and directors elected prior to January 31,1983, to serve until their successors are validly and legally elected; and
(5) to declare Homer Woodard to be without authority to vote that portion of the pledged shares owned by any pledgor without the express consent of the respective pledgor.
Only defendants Woodard, Kyle, Hood and the Bank answered the petition. In connection therewith, an exception of no cause of action was filed and overruled by the trial court. After trial in written reasons for judgment, the trial court concluded that Smart and Waits were in fact the actual owners of 5000 shares of the stock made the subject of this dispute in the proportion of 2500 shares each and interpreted La.R.S. 12:79 as finding that the actual owner rather than the registered owner must be recognized by the Bank as entitled to vote his respective shares absent by-laws to the contrary or some significant corporate interest. Therefore, it was held that Smart and Waits were entitled to vote their shares at the January 31, 1983 meeting; that Woodard had no right to vote these shares; and that all officers and board members elected at that meeting were illegally elected and have no title to those offices. Consequently, judgment was signed:
(1) declaring the proceedings of the January 31,1983 meeting to be null and void;
(2) declaring Kyle, Woodard, Hood, Waits and Madden to have been illegally elected to the offices of directors of the Bank and excluding them from holding these offices;
(3) enjoining these parties from serving in this capacity;
(4) mandamusing Kyle, as President and Chief Executive Officer of the Bank, to call a meeting of the shareholders not less than 15 nor more than 60 days from the date that judgment becomes final for the purpose of electing officers and directors of the Bank to serve until the regular 1984 shareholders' meeting;
(5) reinstating the directors elected at the 1982 meeting until their successors can be elected;
(6) adjudicating Kyle, Waits, Smart and Ingram to be owners of the 10,000 shares of stock in the proportions of one-fourth each subject to Woodard's pledge;
(7) directing that these parties shall have the right to vote 2500 shares of stock each at the special shareholders' meeting to be called; and
(8) declaring the instrument dated November 11, 1981, to be an act of pledge and Woodard, as pledgee, to be without the right to vote the pledged stock without first acquiring its ownership.
It is from this judgment that this appeal is taken by Woodard, Kyle and the Bank who argue that the trial court erred in:
(1) overruling the exception of no cause of action;
(2) holding that the four pledgors had the right to vote 2500 shares of pledged stock each; and
(3) holding that Woodard did not have the right to vote the stock.
Because we have determined that the trial court erred as a matter of law in its *464 holding, we pretermit discussion of the first assignment of error and proceed to a discussion of the merits of the case.
Both sides to this controversy have thoroughly argued orally and in brief their positions which are based on the applicability of the corporate laws of this state to the controversy at issue. While we have noted on our own motion that the bank in question is a national bank created under the laws of the United States, we have been cited nothing and have found nothing in the Federal Banking laws which we feel to be controlling of the issue in question. We recognize the overriding principle that any state law limiting or lessening the right and power granted a national bank by the laws of the United States cannot have any effect and would not be binding on a national bank. However, we also recognize the rule to the contrary that if greater rights are extended to national banks by a state law, than are specifically granted by the laws of the United States and are not in conflict with the powers granted by the United States government, the national bank may be governed thereby. The United States laws governing national banks do not insofar as we have been able to find, prohibit a national bank from defining a shareholder as the holder of record of one or more shares in the corporation; from recognizing a person registered on its records as the owner of shares, as the owner in fact thereof for all purposes, and as the person exclusively entitled to have and to exercise all rights and privileges incident thereto, including the exercise of the right to vote; or from recognizing the pledgee in whose name the pledged shares are registered as the person entitled to vote those shares. Thus, the principles contained within La. R.S. 12:1(R); 79 and 75(D) do not abridge, limit nor do they in fact conflict with any provision of the United States laws affecting national banks, and thus, these provisions have effect to such banks. See First National Bank of Vicksburg v. Drexler, 184 So. 607 (La.App. 2d Cir.1938, writ denied 1938).
Therefore, we shall proceed to consider the issue in light of the applicable provisions of Louisiana law.
A "shareholder" is defined as the holder of record of one or more shares in the corporation. La.R.S. 12:1(R). La.R.S. 12:79 provides:
Except as otherwise provided in the articles or by-laws, a corporation, and its directors, officers and agents, may recognize and treat a person registered on its records as the owner of shares, as the owner in fact thereof for all purposes, and as the person exclusively entitled to have and to exercise all rights and privileges incident to the ownership of such shares; and rights under this section shall not be affected by any actual or constructive notice which the corporation, or any of its directors, officers or agents, may have to the contrary.
Additionally, La.R.S. 12:75(D) provides:
D. A person whose shares are pledged shall be entitled to vote thereon unless and until such shares have been transferred on the books of the corporation to the pledgee; and thereafter the pledgee shall be entitled to vote thereon.
While we have been unable to find any Louisiana cases which precisely deal with the particular factual situation with which we are faced, we have found cases which are instructive and dispositive of the pivotal issue contained herein.
In Redemer v. Hollis, 347 So.2d 48 (La. App. 2d Cir.1977), plaintiff contended that he was the owner of 5% interest in the stock of an equipment manufacturing corporation and filed a mandamus action to compel the corporation and its president to issue him stock reflecting his ownership interest and to allow him to inspect the corporate business records. The trial court found plaintiff to be a shareholder and entitled to have stock certificates issued in his name and to exercise the rights of a shareholder. This Court amended the judgment of the trial court stating:
A corporation is allowed to rely entirely on its records in determining entitlement *465 to access to financial information. LSA-R.S. 12:79 provides:
Except as otherwise provided in the articles or by-laws, a corporation and its directors, officers, and agents, may recognize and treat a person registered on its records as the owner of shares, as the owner in fact thereof for all purposes, and as the person exclusively entitled to have and to exercise all rights and privileges incident to the ownership of such shares; and rights under this section shall not be affected by any actual or constructive notice which the corporation, or any of its directors, officers or agents, may have to the contrary.
Plaintiff is not registered on the corporation's records as the owner of shares. He must compel the corporation to list him as a shareholder prior to exercise of the rights given to shareholders of record.
In Pollock v. Pollock Engineering Co., 365 So.2d 1186 (La.App. 3d Cir.1978), a former wife sought a writ of mandamus ordering the corporation and its officers to cancel a stock certificate for eighty shares in the name of her former husband and issue a new certificate for 40 shares in her name. The 80 shares had been formerly owned by the community of acquets and gains previously existing between the parties. The court recognized that Mrs. Pollock was the owner of one-half of the 80 shares of stock but refused to order the corporation to transfer the 40 shares of stock to her stating:
However, we find the trial judge erred in ordering the corporation and its officers to recognize Betty Pollock as owner of an undivided interest in the 80 shares of stock issued solely in her ex-husband's name and to afford to her all of the privileges of a stockholder. Under the specific language of the Louisiana Corporation Code, a corporation and its officers are bound to recognize as legal owner only the person in whose name a certificate representing shares of stock is issued. Neither the corporation nor its officers is liable to "any one claiming any interest in, or ownership of, said shares, or any part thereof, by virtue of an undisclosed or latent legal or conventional title or interest therein." LSA-R.S. 12:601. Additionally, the Corporation Code provides that only shareholders of record on the books of the corporation are entitled to receive dividends, to vote at meetings, or to exercise subscription rights. LSA-R.S. 12:75 and 12:77. Under these provisions, Betty Bickers Pollock is not entitled to any rights of a shareholder.
In the instant case, the uncontroverted facts reveal that the certificates evidencing the 10,000 shares of stock which Woodard voted were intentionally issued and registered in his name with the knowledge and consent of all parties involved. Clearly, the purpose for this was to keep all of the parties to the transaction from being in violation of Federal law regulating acquisition of controlling interest in a national bank. Furthermore, the stock was pledged to Woodard by all of its purchasers with the knowledge that it was registered in Woodard's name on the Bank's records. The pledge agreement was silent on the question of voting rights. In reality, all parties concede that Woodard had the right to vote the stock standing in his name; however, it is argued that Smart and Waits had the right to direct the voting of this stock by virtue of an oral agreement that Woodard would vote the stock according to their pro-rata shares and their direction. Thus, in effect what is being attempted through this quo warranto, mandamus and injunction proceeding it to recognize the validity of and enforce an oral agreement between four shareholders and Woodard as to how stock registered in the name of Woodard should be voted and to compel the Bank to recognize and implement the agreement which was admittedly disputed.
The corporation laws of this state are designed to set forth certain rules and procedures so that corporations can act and conduct business in spite of ongoing controversies that might exist between shareholders. Any verbal agreement between Woodard and the purchasers as to the voting of *466 this stock is a private contractual matter between the parties and not binding on the Bank, its officers or directors in conducting Bank business. Applying the proper principles of corporate law to this factual situation, we conclude that the corporation bank was legally entitled to recognize Woodard as the shareholder and/or pledgee of record as reflected by the Bank's books and as such, the person legally entitled to vote the stock at the shareholders' meeting on January 31, 1983. Consequently, because the Bank was entitled to recognize Woodard as having the right to vote the shares without restriction, the action taken at that meeting was legal because the shares in question were voted in accordance with law. Accordingly, the ruling of the trial court decreeing the election to be invalid was manifestly erroneous.
Because the function of the writ of quo warranto is narrow and its scope is limited to determining by what authority a person is holding office in a corporation, once a determination is made that a person holds office by virtue of a valid election, the inquiry ceases and the writ should be dismissed. See La.C.C.P. Art. 3901;[2]Foreman v. Hines, 314 So.2d 460 (La.App. 4th Cir.1975).
Because any agreement which the parties may have entered into regarding how Woodard was to vote the stock is a private, contractual matter between the purchasers and Woodard, it is a matter for ordinary litigation and is not properly the subject of a quo warranto or mandamus action. See State v. United Gas Public Service Co., 197 La. 616, 2 So.2d 41 (1941); State ex rel. Arbour v. Board of Managers of Presbyterian Hospital of New Orleans, 131 La. 163, 59 So. 108 (1912). While relief may be obtained against Woodard for breach of contract or to enforce the agreement in question, it may not be obtained in this proceeding.
Because we have found that the election held at the January 31, 1983 meeting was valid we conclude that the writs of quo warranto and mandamus should have been dismissed and the other relief sought in this action should have been denied. Accordingly, the judgment of the trial court is reversed in its entirety. Judgment is rendered recalling and vacating the writs of quo warranto and mandamus and the injunction issued by the trial court and dismissing the claims of plaintiffs at their cost.
JUDGMENT REVERSED AND RENDERED.
NOTES
[1] The newly elected Board members are: (1) Homer Woodard (2) Herschel Kyle (3) M.L. Hood (4) Mack Waits (5) R.H. Madden, III
[2] La.C.C.P. Art. 3901 provides:

Quo warranto is a writ directing an individual to show by what authority he claims or holds public office, or office in a corporation, or directing a corporation to show by what authority it exercises certain powers. Its purpose is to prevent usurpation of office or of powers.